The first case is ContentNexus. I guess it was once Personalized Media v. Stewart, 2023, 1165 and 1166. Mr. Scott. Good morning, Your Honor. Good morning. The basic issues in this case deal with two specific categories. One is whether the patent owner is able to claim the benefit of an earlier application. There are two applications in this case, one filed in 1987 and one in 1981. If, in fact, the patent owner may claim the benefit for the claims in issue to the 81 case, the prior art is removed because it's too late. But the disclosure with respect to programming in each of the two applications is different. It is broader in the second application. Well, I don't think that's exactly correct, Your Honor. What happened is, in the first case, there are specific disclosures. Well, there's a definition in the abstract. Now, putting aside whether a definition in the abstract is controlling or not, that definition says programming is anything received through television or radio, which is intended to entertain, instruct, or inform. But that's analog, right? Excuse me? That's analog, not necessarily digital. The 81 application also discloses the use of digital television in figures 4C through D. And it's specifically called out on the basis of the fact that you decrypt the disclosures made that you can save decryption time by decrypting only the video and not the audio. So there is, within the specification, clear support for each thing which the government has said is not disclosed in the 81 case. I mean, specifically, there's a disclosure of controlling the environment in a home on the basis of downloaded information. There's a disclosure of simulcast. There's a disclosure of control of copyrighted material. There's a disclosure of all aspects of programming that are shown in the 87 case or shown in the 81. Now- The definition you read to us, the term programming refers to everything. That's from the 1987, correct? No, there's also a reference to that in the abstract of the 1981 case. Everything? I'll quote it to you. Programming means everything transmitted over television and radio intended for communication of entertainment or to instruct or inform. I thought that was from 1987, but if you can show me- No, no, no. It's in the abstract of the 1981 case. Can you give me a page so I can find it? Let's see. I don't have the specific, but it's on the first page of the 041 patent in the appendix. I mean, I will provide that after the argument. But- You can provide it on rebuttal. Excuse me? You can provide it on rebuttal. All right, I will. Now, the point here is that with respect to programming- I mean, the word is used in this specification numerous times to imply all different kinds of activity that can be used with the processor of the invention. Now, I just do not understand how- In fact, everything that the government has said is missing, I think we have shown is present there. And therefore, I think there's no question that programming is fully supported in the 1981 case. Now, the second question in terms of priority is whether or not the 1981 case discloses a data channel unaccompanied by analog information. Now, in this case, there's a specific disclosure of a data channel in figure- Yes. In figure 4C- I mean, 6C. And what it shows there is a data-specific data channel used to download a recipe that's going to be presented on a printer at the time that the show is showing how to make the recipe, or how to perform the steps of the recipe. Now, what the government has said is that this data channel comes from a multi-channel cable which has analog data and adjacent channels. Now, the whole idea in radio and television communication of having a channel which is focused on a specific frequency with a bandwidth is to allow, either over the air or by cable or by optical means, allow you to focus on a particular channel and get only the information which is shown on that or found on that channel. So to say that the fact that the channel is adjacent to other channels that have analog information is inconsistent with the terms of the claim. Now, the second aspect of this is that reference is made to analog coding that allows the carrier to be demodulated so that the information, the digital information, can be displayed. Now, these are analog signals, but they are not information. Basic information theory is that the carrier is the conduit and the information is what's carried. I really don't see how you can say that an analog pulse on a carrier is information. But they are non-digital, right? What? They are non-digital. Well, but they're not information. The claim says unaccompanied by any non-digital. You say they're not information. It says non-digital information. A non-digital information transmission. Okay. The coding on the carrier is not information. It's the method by which the information is carried. I mean, it really is kind of like saying that the vehicle is the passengers, right? I mean, you get on the bus and you are a passenger, but the fact that you're on a bus, the bus is inanimate. It's what's being carried that's the information. That's basic information theory I learned in engineering school years ago. Excuse me. Is this argument claim construction or how to read the prior art? It is construction of the claim so that it can be shown to be present in the earlier application. Because I think the argument from the other side is that the board applied a construction that you yourself endorsed. Is that correct? No, I don't think that's correct. That goes to the question of the remand and what is really at issue in this case. What happened in this case, of course, is that it was appealed and it was at this court at the time of the Artex Supreme Court case. And it was remanded to the commissioner, I mean rather the director, excuse me, and for the sole purpose of allowing us to file a director review, which we did. The director vacated the decisions and directed the board to consider not only, you know, to consider the claim construction techniques and holdings in a related case on a patent that has the same disclosure as this one. As a result of that, we made an argument and submission on the basis of an order that the board entered, allowing us to argue each of these points. I don't think anything that we said in the prior proceeding before the remand can bind us at this stage. All right, one other thing. You talk a lot about power oasis in your brief and you say somehow the board acted inconsistent with power oasis. What is the error that you see? All right, in power oasis, what was done was that there was an embodiment first disclosed in the second application. And the question that power oasis was contending that this new embodiment was somehow, and the definition of that new embodiment and that new term was found in the earlier case. And this court held correctly that if there was no disclosure related to that whatsoever, then they were only entitled to the date of the continuation in part. I mean, this is a very different circumstance because these terms are used throughout both applications. The real question is, and this is what the board, I think their error, they were using the term everything, which also appears in the 81 case, to try to say that the disclosure was broadened. Counsel, you're into your rebuttal time. You can either continue or save it. Thank you. All right. Mr. Ayers. Good morning, Your Honors. May it please the court, Peter Ayers on behalf of the United States Patent and Trademark Office. The board in this case faithfully followed this court's prior decisions in both power oasis and its prior ruling in the PMC case on claim construction and reached the correct conclusions that the six challenge claims were unpatentable based on the prior art. That conclusion is supported by substantial evidence, and we would request that this court affirm. Let me start first with the programming issue. Despite what my friend said on the other side, the board found that digital television was not, in fact, described in the original 490 patent application, and that finding is supported by substantial evidence. And I think the easiest way to understand this is to look at the description of digital television in the 635 patent and compare that to the absence of any disclosure in the 493 patent. So if we turn first to APPX 381, column 235 in the 635 patent, it says explicitly refers to digital television transmissions. And the board relied on that description at APPX 29 to show that, in fact, that the 635 patent broadened out the programming that was within the scope of that term in the 635 patent. But it goes on, and this is really you can see how in the course of the time between 1981 and 1987, how the description of digital television becomes more and more fulsome. And this is at column 149, APPX 338. This is now describing an example, the so-called Wall Street Week example, that was actually included in the 490 patent, but now it has a much more fulsome disclosure, and it makes explicit reference to transmissions that include so-called, quote, digital video and, quote, digital audio, okay? And there's a very important factual difference here that's sort of elided by my friend, and that is there's the difference between including digital information that's embedded in an otherwise analog signal, like conventional television programming, and digital video information that encodes the color for a particular pixel, for example. That technology, by PMC's own expert, was only experimental in 1991, and the disclosure simply did not support the digital video that's described in the 1987 specification. The 490 patent is replete with references to using well-known conventional circa 1981 television components to both provide the embedding of the digital information as well as extracting that information. What about the receiving limitation of Claim 18, particularly unaccompanied by any non-digital information? Again, that finding, Your Honor, is supported by substantial evidence. And again, I think the simplest way to think about this is, as the board did, to look at the multi-channel description in the 490 patent. And the board found that even if you were to accept that one of the channels was all digital, which we dispute and the board did not find, that because one channel is accompanied by another channel, that it's all transmitted together, and again, the 490 patent is replete with references to multi-channel transmission and reception. We see that at figures 4E at APPX 5658 and figure 6A at APPX 5660, that the information, and I don't think there's really any dispute, that is included in those adjacent television channels would accompany or that those channels include non-digital information, namely analog television, video, and audio. And I don't think there's any dispute that analog television, video, and audio is quote-unquote information. And therefore, this argument about signaling versus information is really kind of a red herring, because the board didn't find, it limited its construction to just non-digital information and these adjacent channels. It's undisputed that that includes analog information. As far as coming back to programming power oasis, I don't think we heard anything other than perhaps a factual dispute about how the board applied power oasis. The director thinks that that case is on all fours, or this case is on all fours with power oasis. And I think if you actually go back and look at the facts of that case, you'll see that both in the original application and in the later continuation in part application, that there was an embodiment of the customer interface that was described in each. It's just in the later application, like here, they broadened out the disclosure to encompass additional features. In the case of power oasis, that the user customer interface was external to the kiosk. And likewise here, they've broadened out what's included in programming to include this digital video transmission that finds no support in the original application. Counselor, what about the board's finding that GILA teaches a changing decryption technique and that that was supported by substantial evidence? Well, Rana, we're frankly a bit surprised that the appellant has even raised that issue here because they took the exact opposite position before the board, where they argued when they were trying to obtain written descriptive support for changing, the changing keys constitutes changing the encryption techniques, that indeed changing decryption techniques provided descriptive support for changing encryption techniques. Again, here's another example. In their brief, they want to equate now changing encryption techniques with changing encryption algorithms. And while the 635, again, is replete with references to algorithm, the word algorithm doesn't even appear in the 490 patent. So we know that the 490 patent was not talking about changing algorithms when they said changing encryption techniques. So we think, frankly, that argument is frivolous. On the definition of programming? Yes, Your Honor. Does the 1981 use the word everything? It does, Your Honor, and that reference is at APPX 5650 in the abstract. But again, if you compare that with the comparable definition, if you will, of programming, it's not just the everything. It's that it bronze out the, it provides a number of additional examples of programming that fall within the scope of that. But why isn't everything broad enough to capture digital way back in the 1981 specification? Because if you compare, well, first of all, they dispute that that actually constitutes a claim construction, given that it appears in the abstract. But I don't think it really matters whether or not that's definitional. The question is what, that we know that the programming as defined in the 635 patent must embrace these additional examples, including not just digital television, but if you look at Column 6 of the 635 patent at APPX 266, it lists another different example of computer programming as well as combined medium programming. So again, they're expanding out the breadth of that term beyond what's even described in the abstract of the 490 patent. Are there any further questions, Your Honors? Apparently not. Okay. Thank you, Your Honor. We'd ask the Court to adjourn. Thank you, Mr. Wray. Mr. Scott, do you have some rebuttal time? Yes. The, well, you haven't provided the citation, but it is, yeah, 5650. Thank you. Now, the first question is the disclosure of computer programming and everything else is specific in the 81 case because it discusses downloading programming, computer programming to change certain aspects of the way in which the digital, for example, the recipe or the book or the other elements of the control of copyrighted material is done. The computer programming is, of course, referenced in the 81 case because it's inherent in how the various processors work, but it's also disclosed as being downloaded in that application which is found in 6D. Now, with respect to the changing of the encryption technique, the 81 specification in figures 4A through C specifically discloses changing the fashion in which the encryption is done as opposed to controlling the authorization of the encryption or not. So the difference really here is, and Guy is silent on this point, is the key in the normal sense of the word is to open something up, and that's exactly what happens in an encryption process. A technique is the underlying process itself, and that's fully supported by the 81 specification in 4A through D. And specifically also, digital television is specifically disclosed because of the description of decrypting the audio separate from the video. I mean, again, there's no question that the 87 case is more extensive. It's longer. But I don't think there's anything that's been shown that would support the idea that it didn't disclose all of these things that are necessary to obtain priority. Thank you, counsel. We appreciate both arguments. The case is submitted.